IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CLARE M. HOFFMAN,<br>Plaintiff, | §<br>§<br>§ | |
| v. | §<br>§ | No. 3:24-CV-2459-L-BW |
| BELL TEXTRON INC.,<br>Defendant. | §<br>§<br>§ | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

Pending before the Court is Defendant Bell Textron Inc.'s ("Bell") Motion for Summary Judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure. (Dkt. No. 26.)  Pursuant to 28 U.S.C. § 636(b) and Special Order No. 3-354, United States District Judge Sam A. Lindsay referred this case to the undersigned United States magistrate judge for pretrial management, which includes making findings and a recommended disposition when appropriate.  (*See* Dkt. No. 18.)

Having considered the relevant pleadings, the evidence, and the applicable law, and for the reasons explained below, the undersigned **RECOMMENDS** that Bell's Motion for Summary Judgment (Dkt. No. 26) be **GRANTED**.

## I.  BACKGROUND

### A.    Procedural Background

On September 30, 2025, Clare M. Hoffman, represented by counsel, filed a complaint with jury demand, asserting claims of sex discrimination and retaliation under Title VII of the Civil Rights Act of 1964. (*See* Dkt. No. 1.)  Hoffman alleges

that she was subjected to sex-based harassment, including derogatory comments about her appearance, hostile work environment, and retaliation for reporting the conduct. (*See id.*) Hoffman further alleges that she was terminated as a result of engaging in protected activities.

On June 26, 2025, Hoffman filed an Unopposed Motion to Withdraw as Counsel (Dkt. No. 13), which was granted by Judge Lindsay on June 27, 2025 (Dkt. No. 14). Hoffman has appeared pro se in this action since. (*See* Dkt. No. 17 at 1.)

On December 19, 2025, Bell filed the present motion for summary judgment (Dkt. No. 26 ("Motion") ("Mot.")), along with a brief in support (Dkt. No. 27) ("D. Br.") and appendix in support (Dkt. No. 28) ("D. App."). As noted previously, Hoffman did not file a response. Accordingly, the Motion (Dkt. No. 26) is ripe and ready for determination. Hoffman's original complaint (Dkt. No. 1) ("Compl.") remains the operative complaint in this action.

Bell submits the following evidence in support of summary judgment:

- Declaration of Nancy Manriquez ("Manriquez Decl.") (D. App. 001-003);

- Declaration of Jana Hoggatt ("Hoggatt Decl.") (D. App. 004-007) with Exhibit 1: March 29, 2023 Email Exchanges (App. 008-10) and Exhibit 2: April 26, 2023 Email Exchanges (D. App. 011-13);

- Declaration of John Doyle ("Doyle Decl.") (D. App. 014-15) with Exhibit 1: April 3, 2023 Final Written Warning (D. App. 016-17);

- Declaration of Chandria Mercer ("Mercer Decl.") (D. App. 018-19) with Exhibit 1: Ethics and Compliance Investigation Report (D. App. 020-49);

- Declaration of Ashley Cordell ("Cordell Decl.") (App. 050-51) with Exhibit 1: August 30, 2022 Written Warning (D. App. 052-53);

- Declaration of Dawn Meneweather ("Meneweather Decl.") (App. 054-58) with Exhibit 1: April 27, 2023 Complaint (D. App. 059-61);

- Plaintiff's Texas Workforce Commission ("TWC") Charge of Discrimination[1] (D. App. 062-64);

- Deposition of Plaintiff Clare Hoffman ("Hoffman Dep.") (D. App. 065-111) with Deposition Exhibit 15 (D. App. 112-20), Deposition Exhibit 16 (D. App. 121-22), Deposition Exhibit 18 (D. App. 123), and Deposition Exhibit 19 (D. App. 124-28).

(*See* Dkt. No. 28.)

All evidence presented is cited herein to the corresponding D. App. page number(s).  Deposition testimony is additionally cited to the corresponding deposition transcript page number(s) and line number(s).

## B.    Factual Background

This lawsuit centers around Bell's decision to terminate Hoffman (formerly known as Clare Woodall), allegedly as a result of her continued insubordination and inappropriate behavior.  (*See* D. Br. at 1.)  Hoffman alleges that Bell violated Title VII of the Civil Rights Act of 1964 by: (1) terminating, or otherwise discriminating, against her because of her sex; (2) subjecting her to a hostile work environment; and

---

[1] Under a "Worksharing Agreement" between the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission Civil Rights Division ("TWC"), filing a complaint with one agency also satisfies the requirement to file with the other.  Both agencies require that a complainant file within 180 days after the alleged violation, but the Worksharing Agreement expands the EEOC time to file to 300 days.  *See Cisneros v. DAKM, Inc.*, No. 7:13-CV-556, 2014 WL 258755, at *2 (S.D. Tex. Jan. 23, 2014); *Howe v. Yellowbook, USA*, 840 F. Supp. 2d 970, 978 (N.D. Tex. 2011).

(3) terminating or otherwise retaliating against her for complaining about the discriminatory conduct she was experiencing.  (*See* Compl. ¶¶ 61-82.)

### 1.  Hoffman's Factual Allegations

Hoffman contends she was subjected to discrimination "on a regular, daily, and consistent basis commenc[ing] in 2020 and continu[ing] up and through the date of [her] termination."  (Compl. ¶ 15.)  She also contends that Bell hired male employees with less skills and qualifications than Hoffman, and that, despite expressing her desires for a promotion, she was "constantly overlooked."  (*Id.* ¶ 17.) She alleges that because she was "hired in a lesser role, [her] salary was about $30,000.00 less than male employees holding similar positions at Bell."  (*Id.* ¶ 19.)

Hoffman also alleges that she "suffered discrimination for being a plus-size, single woman in her thirties [and] her perceived failure to conform to traditional gender stereotypes as a woman." (*Id.* ¶¶ 21-22.)  Hoffman asserts that "Bell, by and through their agents and employees, would harass, mock, and taunt [Hoffman] creating a hostile work environment" and "spread false information mischaracterizing [Hoffman's] sexuality by assuming she is a lesbian/homosexual when [Hoffman] identifies as a straight, heterosexual woman."  (*Id.* ¶¶ 22-23.)

Hoffman further alleges that that when she transferred to the H-1 unit in March 2022, Supervisor Ashley Cordell began discriminating against her as soon as Hoffman was transferred by "purposely exclud[ing] [Hoffman] from a team messaging group, denying or canceling Hoffman's event requests as "leader of the event planning committee" and planning events without Hoffman's knowledge so as

to exclude Hoffman from attending such events.  (*Id.* ¶¶ 26-27.)  According to Hoffman, "Cordell would often harass Hoffman by making comments about her size and height[; and] Cordell's behavior as a supervisor opened the door for other employees to mock and taunt Plaintiff about her size and weight as a woman."  (*Id.* ¶¶ 30-31.)  Hoffman alleges she was "harassed, mocked, taunted, and ridiculed" during a meeting with Cordell, where Cordell accused Hoffman of "slapping other employees' desks, belittling employees for not eating meat, and commenting on [Hoffman's] weight."  (*Id.* ¶ 33.)  Hoffman alleges she reported the incident to Human Resources.  (*Id.* ¶ 34.)  She also alleges that she declined to answer an internal message from Cordell or go to Cordell's office for a meeting because she "felt intimidated and harassed by Cordell's discriminatory attitude," and thereafter, "Cordell retaliated by giving [Hoffman] her first disciplinary write-up."  (*Id.* ¶¶ 35-36.)

After Hoffman was transferred to the supervision of Greg Treiber in or about November of December of 2022, she alleges she reported "systematic sexual advances" by Trieber, such as Trieber putting his hand on her leg, grabbing her ankle and "fondl[ing] it in a sexual way," and "squeezing her shoulders and/or elbows, and reaching into [her] personal space."  (*Id.* ¶¶ 37-39.)  Hoffman alleges that when she rejected Trieber's sexual advances, "in retaliation, Treiber created a hostile work environment for [Hoffman]."  (*Id.* ¶ 40.)

Hoffman further alleges that during January and February 2023, Aimee Acker and other coworkers "harassed" Hoffman by: (1) spreading false information about

her character; (2) sharing a mugshot of Hoffman taken in 2006,; (3) discussing why Hoffman "had not quit her job yet because they were disgusted by her presence;" (4) audio recording workplace conversations with Hoffman "to later mock and taunt her;" and (5) taking pictures of her walking out of the restroom "to taunt and mock her." (*Id.* ¶¶ 41-45.)  Hoffman alleges that when she reported these incidents, "Bell arranged an Ethics and Compliance investigation" but "ignored all evidence of discrimination, harassment and a hostile work environment and took no further action." (*Id.* ¶ 47.)

Hoffman alleges that after the ethics and compliance investigation, she was isolated "to an empty desk with no supplies, no phone to join meetings, no monitors to connect to her computer, and excluded her from the rest of the employees," allegedly in retaliation for "reporting the discrimination she endured." (*Id.* ¶ 48, 56.) She also alleges that harassment from her coworkers continued, including "subtle harassment" such as coworkers "look[ing] at her in disgust for her physical appearance as a woman." (*Id.* ¶¶ 49-53.)  Finally, Hoffman contends that "throughout April 2023, Trieber prevented [Hoffman] from performing her work" and interfered with her relationships with suppliers. (*Id.* ¶¶ 58-59.)  When Hoffman requested to be included in future meetings with suppliers, "Treiber denied her request and reported her to human resources and management for insubordination." (*Id.* ¶ 59.)  Hoffman was subsequently terminated "effective immediately on May 1, 2023." (*Id.* ¶ 60.)

### 2. Bell's Factual Contentions

Not surprisingly, Bell provides a different version of the events recited in Hoffman's complaint. But having failed to file a response to Bell's Motion, Hoffman does not rebut Bell's description of the circumstances surrounding her employment and ultimate termination.

### a. Hoffman's Employment History at Bell

Bell alleges that Hoffman began her employment as a Supply Chain Procurement Associate on January 19, 2020, at Bell's Amarillo facility. (Manriquez Decl. ¶ 3, D. App. 001.) Prior to this role, Hoffman had no experience in the aerospace industry. (Hoffman Dep. at 43:20-25, D. App. 071.) As a Supply Chain Procurement Associate, Hoffman was responsible for executing standard purchasing procedures to ensure the timely delivery of supplies and material for the Bell program to which she was assigned. (Manriquez Decl. ¶ 4, D. App. 001.) Hoffman was originally assigned to work on the 525 Program under the supervision of John Doyle. (Manriquez Decl. ¶ 5, D. App. 002.) In January 2022, Greg Treiber became Hoffman's direct supervisor after Doyle was promoted. (*Id.*)

Shortly thereafter, Bell determined that its H-1 Program needed additional support due to an increase in business need. (*See* D. Br. at 3.) In March 2022, Hoffman volunteered to transfer to the H-1 team, and Ashley Cordell became her direct supervisor. (Hoggatt Decl. ¶ 4, D. App. 005.) Hoffman generally performed well in her role as a Supply Chain Procurement Associate. (Doyle Decl. ¶ 5, D. App. 015.) In recognition of her contributions to the H-1 team and based on

Cordell's recommendation, Hoffman was promoted to Supply Chain Procurement Professional in July 2022. (*Id*.)

### b. Hoffman's Written Warning and Return to the 525 Team

According to Bell, Hoffman had performed her job duties well to that point, but she began to exhibit disrespectful behavior towards her supervisor and co-workers. (*See* Hoggatt Decl. ¶¶ 4–6, D. App. 005.) Around the same time as her promotion, Hoffman's cube mates reported to Cordell that Hoffman was being rude to them and had slammed her hands on the desk. (Mercer Decl. Ex. 1, D. App. 034.) Cordell addressed this with Hoffman but did not write her up. (*Id*.) Thereafter, on August 29, 2022, Hoffman refused to attend a scheduled one-on-one meeting with Cordell. (Cordell Decl. ¶ 6, D. App. 051.) Cordell sent Hoffman two messages about the meeting to which Hoffman did not respond. (*Id*.) Even when Hoffman's upline manager, Jana Hoggatt, asked to speak with Hoffman about her refusal to attend the one-on-one meeting, Hoffman refused and remained insubordinate. (Hoggatt Decl. ¶ 6, D. App. 005.) The next day, August 30, 2022, Cordell asked Hoffman whether her message system was working to which Hoffman confirmed that it was and that she had received Cordell's messages but chose not to attend the one-on-one. (Cordell Decl. ¶ 7, D. App. 051.) Cordell issued Hoffman a written warning for refusing to attend the one-on-one and ignoring her messages (the "Written Warning"). (Cordell Decl. ¶ 7 and Ex. 1, App. 051-52.)

Hoffman's behavior did not improve after her August 30, 2022 Written Warning, and in fact, became more adversarial towards Cordell. (Hoggatt Decl. ¶ 6,

D. App. 005.)  In an effort to resolve this situation, Hoffman was transferred back to the 525 team in December 2022, again reporting to Greg Treiber, but her disrespectful behavior, interpersonal issues with coworkers, and abrasive attitude continued even after she transferred back to the 525 team.  (Doyle Decl. ¶ 6, D. App. 015.)

### c.  Hoffman Complains of Harassing Behavior from Coworkers

Bell asserts that Hoffman's interpersonal challenges continued even with the transfer back to her original team.  (Doyle Decl. ¶ 6, D. App. 015.)  In January 2023, Hoffman filed a report with Bell's Security team alleging that "her coworkers were engaging in various suspicious behaviors, including talking about a mugshot of Plaintiff taken in 2006, audio recording workplace conversations with her, and/or taking pictures of her outside of a restroom at work."  (Mercer Decl. ¶ 3, D. App. 018.)  Bell Security was unable to obtain evidence to support Hoffman's allegations that coworkers were taking photos and/or audio recordings on the company's premises without authorization.  (*Id.*)  The remainder of Hoffman's allegations were reported to Bell Ethics & Compliance ("E&C") to investigate further.  (*Id.*)  On February 15, 2023, E&C conducted an initial interview with Hoffman to determine the scope of her allegations and thus the scope of the investigation.  (Mercer Decl. Ex. 1, D. App. 022.)  Hoffman raised the following concerns:

- She had suspicions that coworkers were trying to start conversations with her so they could record what she was saying;

- When she stopped by a coworker's desk to chat, the coworker "seemed a little nervous" and another employee sitting nearby "did a really loud fake cough and it seemed like she was signaling someone[;]"

- A similar incident of an employee appearing to be nervous while talking to Hoffman occurred the same afternoon;

- Two female coworkers had "recently taken an unusual interest in [Hoffman's] next living situation[;]"

- A female coworker, Aimee Acker, was showing a mugshot of Hoffman taken in 2006 to other coworkers and generally speaking poorly about her; and

- When Hoffman came out of the restroom on January 24, 2023, it looked like a female coworker was standing by the door to take a picture or video of Hoffman because the coworker tapped her phone as Hoffman walked by.

(Mercer Decl. at ¶¶ 3–5, App. 018-019; Ex. 1, D. App. 022-24.)  Although Hoffman no longer reported to Cordell, she also claimed that Cordell was subjecting her to a hostile work environment.  (Mercer Decl. Ex. 1, D. App. 022-023.)  Hoffman also indicated that she thought the written warning she received from Cordell on August 30, 2022, was in retaliation for Hoffman having previously spoken to HR about Cordell.  (*See id.*, D. App. 023.)  During the investigation, Hoffman subsequently reported a general allegation of retaliation against Treiber based on her annual performance review.  (*Id.*, D. App. 024.)  Although Hoffman complained that Treiber "wrote a negative yearly performance review" (Compl. ¶ 40), Bell's evidence indicates that she received a score of "meets expectations."  (Mercer Decl. Ex. 1, D. App. 024.)  Hoffman did not mention any instances of sexual harassment or

harassment based on her sex during the investigation. (Mercer Decl. ¶ 4, D. App. 019; Hoffman. Dep. at 224:20–25, 225:1–5, D. App. 099-100.)  Hoffman also testified in her deposition that the report to E&C was not about gender discrimination.  (Hoffman Dep. at 224:20–25, 225:1–5, D. App. 099–100.)

As set forth by E&C, the scope of the investigation was to determine whether "Aimee Acker, Ashley Cordell and/or potentially other employees [were] harassing and/or creating a hostile work environment for [Hoffman] in violation of Textron Business Conduct Guidelines and/or Company policy."  (Mercer Decl. Ex. 1, D. App. 020.)  E&C conducted its investigation onsite at Bell Amarillo.  (*Id*.)  In addition to Hoffman, E&C interviewed ten witnesses and reviewed the August 30, 2022 Written Warning and emails provided by Hoffman in support of her allegations.  (*Id*.).

E&C ultimately substantiated Hoffman's claim that Acker was showing Hoffman's mugshot to employees around the office, and Acker received a written warning for not modeling Bell values and contributing to a respectful and inclusive environment.  (*Id*.; D. App. 041-042; Manriquez Decl. ¶ 14, D. App. 003.)  E&C did not, however, substantiate that "Acker, Cordell and/or potentially other employees [were] harassing and/or creating a hostile work environment" for Hoffman, nor did E&C substantiate that Cordell had a "vendetta" against Hoffman.  (Mercer Decl. Ex. 1, D. App. 042.)  E&C acknowledged various factors attributing to Hoffman's perception of a hostile work environment including her past and/or ongoing

interpersonal conflicts with her coworkers and her ongoing distrust and persistent assumption of negative intent towards her coworkers and managers.  (*Id.*)

### d.  Hoffman's Suspension and Final Written Warning

Hoffman's disrespectful behavior, interpersonal issues with coworkers, and abrasive attitude continued after she transferred back to the 525 team in December 2022.  (Doyle Decl. ¶ 6, D. App. 015.)  Her behavior continued to escalate, and on March 29, 2023, Hoffman and Treiber exchanged a series of emails, during which Hoffman's contentious tone and manner of communication were deemed disrespectful and insubordinate.  (Hoggatt Decl. ¶ 7, D. App. 005; Exhibit 1, D. App. 008.)  Following this incident, Hoggatt reached out to Bell HR, E&C, and Legal to discuss the possibility of terminating Hoffman as she could no longer tolerate Hoffman's continued insubordination towards leadership, calling her "unmanageable."  (*Id.*)

Hoffman was not terminated at that time.  (Hoggatt Decl. ¶ 8, D. App. 005.)  But based on Hoffman's continued insubordination toward her leadership and inability to demonstrate sustained improvement in the behaviors previously addressed in the August 2022 Written Warning, Hoffman was issued a Disciplinary Suspension and Final Written Warning on April 3, 2023 (the "Final Written Warning") for inappropriate behaviors and insubordination regarding her interpersonal interactions and communications towards her coworkers, supervisor, and other leaders in the supply chain organization.  (*Id.*; Doyle Decl. ¶ 7, D.  App.

015; Ex. 1, D. App. 016.)  Hoffman was suspended from work without pay from April 4 to April 6, 2023.  (Manriquez Decl. ¶ 7, D. App. 002.)

When Hoffman returned to work on April 10, 2023, following her suspension, Bell Amarillo HR Business Partner Dawn Meneweather facilitated a meeting between Hoffman and Treiber to set expectations and reiterate the immediate need to correct the behavioral deficiencies and exhibit sustained improvement as outlined in the Final Written Warning.  (Meneweather Decl. ¶ 3, D. App. 054.)  Both Hoffman and Treiber also agreed to regular check-in meetings to discuss Hoffman's progress with Bell HR as the facilitator.  (*Id*.)  The first check-in meeting was scheduled for April 27, 2023 at 10:30 a.m.  (*Id*.)

### e.  Hoffman's Continued Insubordination and Subsequent Termination

On April 26, 2023, Hoffman again exchanged contentious emails with Treiber, openly challenging Treiber's management of his team and his decision not to include her in conversations with one of Bell's suppliers.  (Hoggatt Decl. ¶ 9; Ex. 2, D App. 006, 011.)  Hoffman did not agree with Treiber's decisions and escalated the matter to Hoggatt.  (*Id*.)  When Hoggatt reminded Hoffman that Treiber had the authority to engage in conversations directly with suppliers without the input of the entire team, Hoffman did not let the issue go and continued to press for answers and reasons as to why she was not involved in discussions.  (*Id*.)  Hoggatt reiterated Treiber's role as Manager Procurement, attempting to explain to Hoffman that as

manager, Treiber had a greater awareness of the situation and was privy to more information that Hoffman about the supplier relationship.  (*Id.*)

Based on Hoffman's continued contentious behavior and the fact that she could not exhibit sustained improvement in accordance with expectations laid out in the Final Warning, Hoggatt decided to move forward with termination.  (*See id.*) Immediately after sending her email response to Hoffman, Hoggatt again reached out to Bell HR to request approval to move forward with Hoffman's termination based on her behavior—specifically, her "continuing to create a hostile work environment with her manager and her team."  (Hoggatt Decl. ¶ 9; Ex. 2, D. App. 011.)

The next day, April 27, 2023, Hoffman, Meneweather, and Treiber were scheduled to conduct their first check-in meeting at 10:30 a.m.  (Manriquez Decl. ¶ 8, D. App. 002).  At approximately 9:18 a.m. that morning, shortly before the check-in meeting, Hoffman sent Meneweather an email, describing various concerns, including reasserting alleged incidents that had been investigated by E&C and alleging for the first time inappropriate behavior or touching by Treiber. (Meneweather Decl. ¶ 4, D. App. 055; Ex. 1, D. App.059.)  Specifically, Hoffman alleged that Treiber tapped her ankle and gave her a hug during a one-on-one meeting and touched her on the shoulder or elbow on other occasions.  (*Id.*)

Hoffman did not state when these events allegedly occurred, but her email indicates that this would have occurred after she moved to Treiber's team but "before his retaliation on my performance review," which indicates that the alleged behavior

14

would have potentially occurred prior to the time E&C conducted its investigation. (*Id.*) (Meneweather Decl. ¶ 4, D. App. 055; Ex. 1, D. App. 059.) Despite being asked by the E&C investigator whether she had anything else to report, Hoffman did not mention this allegation during either of her E&C investigation interviews, or at any point during the investigation. (Mercer Decl. ¶ 4, D. App. 019; Ex. 1, D. App. 20.) After receiving the email from Hoffman and before the check-in meeting, Meneweather informed her supervisor, Nancy Manriquez, about the email, but did not tell anyone else. (Meneweather Decl. ¶ 4; D. App. 055.)

The check-in meeting proceeded as scheduled. (*Id.* ¶ 5, D. App. 055). During the check-in meeting, Hoffman was "combative and disrespectful and yelled at [Meneweather] and Treiber." (*Id.*) When Hoffman entered the room, she refused to speak to Treiber, and when he said good morning; her response was "let's get to it." (*Id.*) "This curt response set a negative tone in the room." (*Id.*) For example, when Hoffman tried to discuss Hoffman's progress with various suppliers, she became "agitated" when she got to the Bell supplier about which she had disagreed with Treiber the day before. (*Id.* ¶ 6, D. App. 055.) When Treiber attempted to explain his management decisions and his reasoning for not including her in communications with the supplier, Hoffman replied that "Treiber should stay out of it because his interference [ ] was holding things up." (*Id.* ¶ 9, D. App. 056.) Hoffman refused to listen to Treiber and spoke over him with a raised voice. (*Id.* ¶¶ 6, 9, D. App. 055-56.) Hoffman also stated that Treiber and Meneweather were "against her because she turned in [Ashley Cordell] and had an investigation." (*Id.* ¶

10, D. App. 056.)  Meneweather cautioned Hoffman to lower her voice as "we were all adults[,] and we need to be respectful and professional" and that they could not solve any issues if she "was going to continue to speak in this manner."  (*Id.* ¶ 10, D. App. 056.)  Meneweather had to interject in the conversation on multiple occasions because Hoffman was "combatant and disrespectful to her manager and to [Meneweather]."  (*Id.* ¶¶ 6, 8, 10–11, D. App. 055–56.)  Eventually Treiber ended the meeting, stating it was "unproductive" and asked Hoffman to leave his office.  (Meneweather Decl. ¶ 10, D. App. 056.)  Hoggatt was in her office during the meeting and could hear Hoffman yelling.  (Hoggatt Decl. ¶ 10, D. App. 006.)

Following the meeting, Meneweather went to Hoggatt's office to fill her in on Hoffman's behavior during the meeting, but Hoggatt "was already aware of some of this as she could hear the meeting due to proximity."  (*Id.* ¶ 12, D. App. 057.)  "Hoggatt expressed her frustration with Hoffman's continued disrespectful behavior and insubordination" and indicated that she had had enough of Hoffman's behavior and was "done" with Hoffman.  (*Id.*)  Meneweather did not tell Hoggatt about the email from Hoffman until after this conversation.  (*Id.*)

Hoggatt and Bell Amarillo HR Site Leader Nancy Manriquez met with Hoffman shortly after the meeting with Treiber to communicate that her behavior, including her ongoing insubordination, would not be tolerated and requested that Hoffman leave the premises.  (Manriquez Decl. ¶ 11, D. App. 003; Hoggatt Decl. ¶ 12, D. App. 006.)  "Although the decision had been made to terminate [Hoffman] at that point, [Hoggatt] was concerned for the safety of other employees based on

[Hoffman's] behavior and decided not to inform [Hoffman] at that time of her termination." (Hoggatt Decl. ¶ 13, D. App. 006.)  Manriquez notified Hoffman of her termination by telephone on May 2, 2023.  (Manriquez Decl. ¶ 12, D. App. 003.)

### e.  Hoffman's Post-Termination Conduct

Following her termination, Hoffman reportedly engaged in increasingly "erratic and concerning behavior." (*See* D. Br. at 11.)   Hoffman admitted making multiple attempts to communicate with former supervisor Doyle by email, telephone, and text message.  (*See* Hoffman Dep. at 299:1–25, 300:1–8, 301:2–17, 311:6–25, D. App. 101–104, 112, 121.)  In November 2023, Hoffman sent multiple text messages to Doyle, including some at 4:44 a.m., demanding that Bell give her job back and alleging Doyle was the reason for her current situation.  (*Id*.)  In May 2024, Hoffman emailed Doyle accusing him of placing a tracking device on her vehicle.  (Hoffman Dep. at 319:5–12, D. App. 105, 123.)  In August 2024, she sent Venmo messages to Doyle requesting $5,000.00, and asking to move in with him, stating "I don't want to be with anyone else but you," and "Let's do this life together."  (Hoffman Dep. at 331:9–25, 332:1–8, D. App. 106–107, 124.)

## II.  LEGAL STANDARDS

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual "issue is material if its resolution could affect the outcome of the action."  *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003).  "A factual dispute is 'genuine,' if the evidence is such that a reasonable [trier

of fact] could return a verdict for the nonmoving party." *Crowe v. Henry*, 115 F.3d 294, 296 (5th Cir. 1997).

A party seeking summary judgment bears the initial burden of showing the absence of a genuine issue for trial. *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (citation omitted). The movant's burden can be satisfied by demonstrating that there is an absence of evidence to support the nonmoving party's case, which the nonmovant bears the burden of proving at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets its initial burden, the nonmovant must show that summary judgment is not proper. *Duckett v. City of Cedar Park*, 950 F.2d 272, 276 (5th Cir. 1992) (citation omitted). The parties may satisfy their respective burdens "by tendering depositions, affidavits, and other competent evidence." *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992) (citing Fed. R. Civ. P. 56(e); *Int'l Shortstop, Inc. v. Rally's*, 939 F.2d 1257, 1263 (5th Cir. 1991)).

"The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." *Esquivel v. McCarthy*, No. 3:15-CV-1326-L, 2016 WL 6093327, at *2 (N.D. Tex. Oct. 18, 2016) (citing *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1988)). "Rule 56 does not impose a duty on the court to 'sift through the record in search of evidence' to support the nonmovant's opposition to the motion for summary judgment." *Id.* (citing *Ragas*, 136 F.3d at 458; *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992)). All evidence must

be viewed in the light most favorable to the party opposing the summary-judgment motion. *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993) (citing *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986)).

When a nonmoving party does not file any response to a motion for summary judgment, the "failure to respond does not permit the court to enter a 'default' summary judgment." *Boyd v. Fam. Dollar Stores of Texas, LLC*, No. 3:22-CV-1368-D, 2023 WL 4141052, at *1 (N.D. Tex. June 22, 2023). But the Court is permitted to accept the moving party's evidence as undisputed. *See Tutton v. Garland Indep. Sch. Dist.*, 733 F. Supp. 1113, 1117 (N.D. Tex. 1990). "A summary judgment nonmovant who does not respond to the motion is relegated to her unsworn pleadings, which do not constitute summary judgment evidence." *Bookman v. Shubzda*, 945 F. Supp. 999, 1002 (N.D. Tex. 1996) (citing *Solo Serve Corp. v. Westowne Assocs.*, 929 F.2d 160, 165 (5th Cir. 1991)).

The verified complaint of a pro se litigant can be considered as summary judgment evidence to the extent such pleadings comport with the requirements of Rule 56(e). *See King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994); *accord Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003) ("On summary judgment, factual allegations set forth in a verified complaint may be treated the same as when they are contained in an affidavit."). But, here, Hoffman's complaint (Dkt. No. 1) is unverified. *See Mirant Corp. v. F.E.R.C.*, No. 4:03-cv-1174-A, 2014 WL 212997, at *2 n.2 (N.D. Tex. Jan. 26, 2004) (finding that a complaint was not "'verified' in any

legal sense [since] [i]t [was] not accompanied or supported by an affidavit or a declaration").

And because the pleadings are not verified and Hoffman has presented no summary judgment evidence, the Court is allowed to accept Bell's facts as undisputed. *See Estate of Newton ex rel. Newton v. Grandstaff*, No. 3:10-CV-809-L, 2012 WL 3013929, at *2 (N.D. Tex. July 20, 2012). And "a court may grant an unopposed summary judgment motion if the undisputed facts show that the movant is entitled to judgment as a matter of law." *Bryan v. Cano*, No. 22-50035, 2022 WL 16756388, at *4 (5th Cir. Nov. 8, 2022) (cleaned up); *accord Bustos v. Martini Club Inc.*, 599 F.3d 458, 468-69 (5th Cir. 2010) (although "a district court may not grant a motion for summary judgment merely because it is unopposed," "[t]he defendants submitted competent summary judgment evidence showing that there were no genuine issues of fact for trial," and the plaintiff "did not respond to the motion for summary judgment in the district court and therefore failed to carry his burden of showing that material factual issues existed" and so "cannot now assert that the district court's reliance on defendants' uncontested evidence was improper" (cleaned up)); *Williams v. Sake Hibachi Sushi & Bar, Inc.*, No. 3:18-CV-517-D, 2020 WL 3317096, at *6 (N.D. Tex. June 18, 2020).

## III. ANALYSIS

For the reasons discussed below, the undersigned concludes that Bell is entitled to summary judgment as a matter of law on all claims.

**A.    Hoffman's disparate treatment claim fails as a matter of law.**

Hoffman alleges that Bell hired male employees with fewer skills and qualifications than Hoffman, and she was constantly overlooked for a promotion. (Compl. ¶¶ 16–17.)   She alleges that, because she was "hired in a lesser role, [her] salary was about $30,000.00 less than male employees holding similar positions at Bell." (Id. ¶ 19.)  Hoffman claims that Victor Kommavongsa was hired or promoted into a better role with higher pay over her because he was a man.  (Compl. ¶¶ 17-18.) For several reasons, Hoffman's disparate treatment claim cannot survive summary judgment analysis.

### 1.  Hoffman failed to exhaust her administrative remedies.

Hoffman claims that Kommavongsa was hired or promoted into a better role with higher pay over her because he was a man (Compl. ¶¶ 17-18), but Hoffman made no such allegations in her TWC Charge (*see* D. App. 062). To the extent that Hoffman now attempts to bring such claims here, they are barred for failure to exhaust administrative remedies.  It is well established that a plaintiff in an employment discrimination case may seek relief only for alleged acts that were presented to the EEOC for investigation or that could reasonably be expected to grow out of the charge of discrimination.  *Young v. City of Houston*, 906 F.2d 177, 179 (5th Cir. 1990).  "An employee's failure to include a claim in h[er] EEOC charge prevents the employee from suing on that claim, unless what was in the charge would have led the EEOC to investigate and would have put the employer on notice

21

that [the employee] would be pursuing that claim." *Goswami v. Unocal*, No. H-12-2953, 2013 WL 5520107, at *7 (S.D. Tex. Oct. 3, 2013).

"The scope of a Title VII complaint is limited to the scope of the investigation which can reasonably be expected to grow out of the charge of discrimination." *Thomas v. Tex. Dep't of Crim. Just.*, 220 F.3d 389, 395 (5th Cir. 2000); s*ee also Jennings v. Towers Watson*, 11 F.4th 335, 342 (5th Cir. 2021). A district court can entertain only those claims that are either included in an EEOC charge or are based on conduct subsequent to the EEOC charge that is reasonably related to the conduct alleged in the charge. *See Smith v. AT&T Mobility Servs., L.L.C.*, No. 21-20366, 2022 WL 1551838, at *2 (5th Cir. May 17, 2022) (unpublished); *Randel v. U.S. Dep't of the Navy*, 157 F.3d 392, 395 (5th Cir. 1998). "Courts should not condone lawsuits that exceed the scope of EEOC exhaustion, because doing so would thwart the administrative process and peremptorily substitute litigation for conciliation." *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 273 (5th Cir. 2008). An EEOC complaint must be "sufficiently precise" to describe the "action(s) or practice(s) that form the basis of the complaint." 29 C.F.R. § 1614.106(c).

To determine whether an allegation falls within the scope of a charge, a court must "engage in fact-intensive analysis of the statement given by the plaintiff in the administrative charge, and look slightly beyond its four corners, to its substance rather than its label." *Pacheco v. Mineta*, 448 F.3d 783, 789 (5th Cir. 2006). Even so, a "crucial element" of the EEOC charge "is the factual statement contained therein." *Manning v. Chevron Chem. Co.,* 332 F.3d 874, 879 (5th Cir. 2003) (quoting *Sanchez v.*

22

*Standard Brands, Inc.*, 431 F.2d 455, 462 (5th Cir. 1970)). "The court will not read the EEOC charge so liberally 'that a plaintiff does not need to state the basic facts that make up his discrimination claim because a plaintiff does not need legal assistance to merely articulate the facts underlying his claims.'" *Warren v. Harris Cnty.*, No. 4:15-CV-02142, 2019 WL 13257716, at *5 (S.D. Tex. Oct. 30, 2019) (citing *Stanley v. Univ. of Tex. Med. Branch, Galveston, TX*, 425 F. Supp. 2d 816, 822 (S.D. Tex. 2003) (internal citations omitted). Claims in a lawsuit are not exhausted unless they are "like or related" to the claims in the charge. *McClain*, 519 F.3d at 273.

Here, the "Particulars" section of Hoffman's Charge does not mention any allegations of failure to promote or unequal pay. (*See* D. App. 062.) She only mentions being placed in a hostile work environment because a coworker showed her mugshot to other employees; being bullied and touched inappropriately by Trieber; and being wrongfully terminated after she reported bullying. (*See id*.) These skeletal allegations would not have reasonably led to the EEOC investigating claims of failure to promote or unequal pay, nor put Bell on notice of such claims.

Because Hoffman failed to exhaust administrative remedies on any discrimination claims based on disparate treatment related, she cannot assert these claims in federal court. Accordingly, her discrimination claim based on failure to promote or failure to receive equal pay should be dismissed on this basis.

**2. Hoffman's allegations of discriminatory actions before October 4, 2022 are time-barred.**

A plaintiff alleging discrimination under Title VII must timely file a charge of discrimination with the EEOC within 300 days after the alleged discrimination occurred. *Stith v. Perot Sys. Corp.*, 122 F. App'x 115, 117 (5th Cir. 2005); *see Pacheco*, 448 F.3d at 788–91; *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378–79 (5th Cir. 2002). This 300-day time limit operates as a statute of limitations. *Storbeck v. Saks Fifth Ave.*, 224 F.3d 764, 764 (5th Cir. 2000). Claims that are not based on any alleged discrimination that occurred within the 300-day window must be dismissed. *Woods v. Lancaster Indep. Sch. Dist.*, 834 F. Supp. 2d 512, 516 (N.D. Tex. 2011) (citing *Taylor*, 296 F.3d at 379).

Here, Hoffman's lawsuit contains allegations related to events that occurred from the beginning of her employment with Bell in January 2020 through her termination in May 2023. Yet, Hoffman filed her EEOC Charge of Discrimination on July 31, 2023. (*See* D. App. 062.) Accordingly, any allegations occurring prior to October 4, 2022 (300 days before July 31, 2023) are untimely and cannot be the basis of Hoffman's claims. *See Anderson v. City of Dallas*, 116 F. App'x 19, 27 (5th Cir. 2004) ("An individual [raising claims] under Title VII must file a charge of discrimination with the EEOC within 300 days of learning of the allegedly adverse employment action."); *Hendricks v. Boy Scouts of America*, No. 3:15-CV-00304-M, 2015 WL 5459612, at *5–6 (N.D. Tex. Sept. 16, 2015).

24

In addition to contending that Bell discriminated against her on the basis of sex when she was terminated (Compl. ¶ 64), Hoffman also appears to allege that she was generally treated unfairly because of her sex. (*Id.* ¶¶ 16–17, 26–27.) Specifically, Hoffman asserts the following non-termination adverse employment actions, all of which are time barred:

- Bell hired men with less skills and qualifications than Hoffman, like Kommavongsa, and she should have been hired or promoted into a better role with higher pay. (*Id.* ¶¶ 16–17);

- While assigned to the H-1 team, Cordell excluded Hoffman from a team message thread (*See id.* ¶ 26); and

- In the summer of 2022, Cordell cancelled a team event that Hoffman planned (*Id.* ¶ 27).

Even assuming these alleged non-termination adverse employment actions actually occurred and qualify as an adverse employment action under Title VII, Hoffman's discrimination claim based on these allegations fails because they occurred prior to October 4, 2022. Hoffman claims that Kommavongsa was hired or promoted into a better role with higher pay over herself because he was a man. (Compl. ¶¶ 17-18.) But Kommavongsa was hired by Bell as a Supply Chain Procurement Professional on September 29, 2019, before Hoffman was hired; he was promoted to Supply Chain Procurement Senior Professional on August 25, 2024, after Hoffman's termination; and he did not receive any other promotions or job title changes during this time. (Hoggatt Decl. ¶ 16, D. App. 007.) Thus, to the extent Hoffman alleges that she should have been hired into a better role initially, this claim is also time barred as Hoffman was hired on January 19, 2020.

Hoffman's claims regarding Cordell are also time barred.  Hoffman alleges that she was excluded from a team group message by Ashley Cordell when she joined the H-1 team.  (Compl. ¶ 26.)  Hoffman admits that this would have occurred shortly after her transfer in March 2022.  (Hoffman Dep. at 86:3–25, 87:1–5, D. App.079–080.)  But Hoffman testified during her deposition that she is not actually even sure if she was excluded from a group text message.  (Hoffman Dep. at 88:5–9; D. App. 081).  As such, Hoffman has no evidence of this alleged fact that she uses to support her hostile work environment claim.  Hoffman further alleges she was treated unfavorably when Cordell cancelled a team event that Hoffman planned. (Compl. ¶ 27.)  Hoffman acknowledges, however, that this incident occurred in the Summer of 2022.  (*Id*.)  Thus, to the extent Hoffman's disparate treatment sex discrimination claim relies on allegations of events that occurred before the 300-day time limit, such allegations should be dismissed as time barred.

### 3. Hoffman has not established her prima facie case that she was terminated because of her sex.

Title VII prohibits employers from taking an adverse employment action against an employee because of their sex.  *See* 42 U.S.C. § 2000e-2(a).  A plaintiff may rely on direct or circumstantial evidence to establish a prima facie case of discrimination under Title VII.  *See Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007).  Because Hoffman relies on circumstantial evidence for her sex discrimination claims, the *McDonnell Douglas* burden-shifting analysis applies.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973).

Under the *McDonnell Douglas* framework, Hoffman bears the initial burden of establishing a prima facie case of discrimination. *Id.* If she is successful, the burden then shifts to *Bell* to articulate a legitimate, nondiscriminatory reason for Hoffman's termination. *Id.* Finally, the burden shifts back to Hoffman to show that Bell's proffered reason is pretext for sex discrimination. *Id.* at 807. To establish a prima facie case for sex discrimination, a plaintiff must show that: (1) she belongs to a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was replaced by someone outside her protected class, or similarly situated employees outside her protected class were treated more favorably under nearly identical circumstances. *Earle v. Aramark Corp.*, 247 F. App'x 519, 523 (5th Cir. 2007).

Hoffman cannot satisfy the fourth element of her prima facie case of sex discrimination because she has not identified a proper comparator. The burden to prove discrimination by comparison to other employees is a steep one. The plaintiff must prove that she was treated less favorably than similarly situated employees outside of her protected class, under virtually identical circumstances. *See, e.g.*, *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009). To be "similarly situated," comparators must be "nearly identical." *Lee*, 574 F.3d at 260. They must have "held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." *Id.* "[C]ritically, the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered

comparator who allegedly drew dissimilar employment decisions." *Id.* The Fifth Circuit has consistently "defined 'similarly situated' narrowly, requiring the employees' situations to be 'nearly identical.'" *West v. City of Houston, Texas*, 960 F.3d 736, 740 (5th Cir. 2020) (quoting *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 406 (5th Cir. 2005)).

Hoffman has provided no evidence that she was replaced by a man or that Bell did not terminate a man under nearly identical circumstances. In fact, Hoffman does not even allege in her complaint that she was replaced by a man, nor does she identify any man in nearly identical circumstances that she claims should have been terminated but was not. (*See generally* Compl. ¶¶ 62–70.) Hoffman merely speculates that if she "was not a female" she would not have been terminated. (*Id.* ¶ 70.) Hoffman's mere speculation and subjective belief of discriminatory intent, however, are insufficient to support her claim. *See Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000) (evidencing the Court's refusal to rely on a plaintiff's subjective belief of discriminatory intent).

Because Hoffman has provided no evidence that she was replaced by a man or treated less favorably than a man under nearly identical circumstances, she has not satisfied the fourth element of her prima facie case. Therefore, Bell is entitled to summary judgment on Hoffman's sex discrimination claim on this basis. And even if Hoffman could establish the prima facie elements of her discrimination claim, her claim still fails as a matter of law because—as discussed in further detail below—Bell has articulated a legitimate, nondiscriminatory reason for Hoffman's termination.

Under the *McDonnell Douglas* framework, the burden shifts back to Hoffman to show that Bell's proffered reason is pretext for sex discrimination. *McDonnell Douglas*, 411 U.S. at 802–03, 807. Having failed to present any evidence in opposition to summary judgment, Hoffman has not met this burden.

**B.    Hoffman's Sexual Harassment Claim**

Hoffman asserts a hostile work environment sexual harassment claim based on two general categories of allegations: (a) allegations of harassing comments and general conduct; and (b) allegations of inappropriate touching. (*See generally* Compl.) The general allegations of harassing conduct asserted in Hoffman's complaint can be summarized as follows: (1) comments regarding Hoffman's size, weight, and appearance (*id*. ¶¶ 22, 30, 52, 53); (2) comments regarding Hoffman's assumed sexuality (*id*. ¶¶ 23, 24); (3) allegations that a coworker shared Hoffman's mugshot with other employees (*id*. ¶ 41); (4) allegations that coworkers disliked Hoffman (*id*. ¶¶ 42, 43, 49); and (5) allegations that coworkers recorded or photographed Hoffman without her authorization to "mock and taunt her (*id*. ¶¶ 44, 45). Hoffman's allegations of inappropriate touching all involve interactions with Treiber, who Hoffman avers made "sexual advances" by fondl[ing] [her ankle "in a sexual way," (*id*. ¶ 38); "forcing" her to hug him (*id*. ¶ 39); and "squeezing her shoulder and/or elbows, and reaching into [her] personal space" (*id*.).

To establish a prima facie sexual harassment claim based on hostile work environment, an employee must show: (1) she belongs to a protected class; (2) she was subject to unwanted or unwelcome sexual harassment; (3) the harassment was

based on sex; (4) the harassment affected a "term, condition, or privilege of employment"; and (5) the employer "knew or should have known of the harassment and failed to act promptly to address it." *Cerda v. Blue Cube Operations, L.L.C.*, 95 F.4th 996, 1003 (5th Cir. 2024).

Hoffman may prove her sexual harassment claim either by establishing that a tangible employment action was taken against her because of her sex (quid pro quo harassment) or by establishing that a supervisor with immediate or successively higher authority discriminated against her because of her sex and created a hostile or abusive environment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 786–87 (1998); *Burlington Indus. v. Ellerth*, 524 U.S. 742, 751 (1998); *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 409 (5th Cir. 2002); *Casiano v. AT&T Corp.*, 213 F.3d 278, 283–84 (5th Cir. 2000); *Butler v. Ysleta Indep. Sch. Dist.*, 161 F.3d 263, 268–69 (5th Cir. 1998). If an employee can show that a tangible employment action resulted from the employee's response to sexual harassment, the employer is vicariously liable for the actions of the supervisor under Title VII; no affirmative defense will be heard. *Casiano*, 213 F.3d at 284. If the employee did not suffer a tangible employment action, the suit is a "hostile environment" case. *See id*.

1. **Hoffman has failed to establish a quid pro quo harassment claim against Treiber.**

Although Hoffman's complaint makes several allegations concerning Treiber's alleged inappropriate touching and subsequent retaliatory conduct, a plain reading of her complaint only asserts a hostile work environment sexual harassment claim, not

a quid pro quo sexual harassment claim.  (*See* Compl. ¶¶ 40, 64–69.)  And although

Hoffman makes vague references to Treiber's alleged "retaliatory conduct" because

she reported his "systematic sexual advances," there is no evidence in the record to

demonstrate that Hoffman was subject to a tangible employment action in relation to

any alleged inappropriate touching by Treiber.  "A tangible employment action

constitutes a significant change in employment status, such as hiring, firing, failing to

promote, reassignment with significantly different responsibilities, or a decision

causing a significant change in benefits."  *Ellerth*, 524 U.S. at 761.

Here, the only examples of Treiber's alleged retaliatory conduct provided in

Hoffman's complaint  are that: (1) Treiber wrote her a negative yearly performance

review in early 2023; (2) he mocked her by calling her "little lady" and other

sarcastic nicknames; and (3) he sent incorrect information to a client that deliberately

delayed Hoffman's ability to close out purchase orders.  (Compl. ¶ 40.)  Because

none of these allegations constitute a tangible employment action, Hoffman's

allegations regarding Treiber are properly analyzed under a hostile work

environment framework.  *See Casiano*, 213 F.3d at 283.

### 2.  Hoffman's hostile work environment claim fails as a matter of law.

Because Hoffman failed to respond to Bell's motion for summary judgment,

she failed to identify any evidence that supports her hostile work environment claim,

which was her burden to survive summary judgment.  *See Esquivel*, 2016 WL

6093327, at *2 (internal citation omitted).  Lacking any such evidence, "[Hoffman] is

relegated to her unsworn pleadings, which do not constitute summary judgment

evidence." *Bookman*, 945 F. Supp. At 1002 (citing *Solo Serve Corp.*, 929 F.2d at 165). Furthermore, the Court is permitted to accept Bell's evidence as undisputed. *Tutton*, 733 F. Supp. at 1117.

### a. Hoffman has provided no evidence to support her harassment claim.

Because there is no competent summary judgment evidence establishing that any of the alleged harassing conduct or inappropriate touching actually occurred, Hoffman cannot establish the second element of her prima facie case. Accordingly, summary judgment as a matter of law is warranted on that basis alone.

### b. Hoffman has not shown that any of the alleged harassment was based on her sex.

Next, even if Hoffman could present sufficient evidence of the second element of her prima facie case, she cannot satisfy the third prong—that the alleged harassment was based on sex. Hoffman merely contends that she suffered discrimination based on her "size, weight, and perceived failure to conform to traditional gender stereotypes as a woman," which allegedly created a hostile work environment. (Compl. ¶¶ 20–23.) According to Hoffman, her fellow employees "would harass, mock, and taunt [and] spread false information mischaracterizing her as a lesbian/homosexual." (*Id*. ¶¶ 22-23.)

"[N]umerous courts, including [the Fifth Circuit], have recognized that a plaintiff can satisfy Title VII's because-of-sex requirement with evidence of a plaintiff's perceived failure to conform to traditional gender stereotypes." *E.E.O.C. v. Boh Bros.*, 731 F.3d 444, 454 (5th Cir. 2013) (internal citation omitted); *see also Price*

*Waterhouse v. Hopkins*, 490 U.S. 228 (1989).   In *Price Waterhouse*, the Supreme Court observed "clear signs" that a woman with an "aggressive" personality was perceived negatively by some of the partners in her accounting firm, with one partner describing her as "macho," another suggesting that she "overcompensated for being a woman," and a third advising her to take "a course at charm school."  *Id.* at 235 (citations omitted).  The plaintiff's evaluators suggested that she should "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry."  *Id.* (citation and internal quotation marks omitted).  In *Boh Bros.*, the Fifth Circuit held that a plaintiff may satisfy Title VII's "because of sex" requirement in other ways, including "with evidence of sex-stereotyping."  *Boh Bros.*, 731 F.3d at 454–56.  Epithets directed toward a person's sexuality may constitute evidence of sex-stereotyping.  *Id.* at 457.  For example, in *Boh Bros.*, evidence was offered that suggested sex-stereotyping when the defendant called the plaintiff "'fa—ot,' 'pu—y,' and 'princess,' often 'two to three times' per day" to denigrate plaintiff's masculinity.  *Boh Bros.*, 731 F.3d at 457–59.

By contrast, Hoffman offers no evidence of sex-stereotyping, nor do the allegations in her complaint suggest that any sex-based epithets were directed toward her by Treiber or any other Bell employee.  Hoffman merely relies on her own subjective belief of discrimination based on her own speculation that others viewed her as "not conforming to stereotypical gender stereotypes" or assumed she was homosexual based on her appearance.  (*See, e.g.*, Compl. ¶¶ 23-24, 52.)  Most of Hoffman's allegations of harassment and hostile work environment are based on her

own perception that other employees believed she was not conforming to traditional gender stereotypes.  She did not show (or even plausibly allege) that others actually believed she was failing to conform to traditional gender stereotypes and that such beliefs were the motivation for the alleged harassing comments and other conduct of which Hoffman complained.  (*See generally* Compl.)

For example, concerning Hoffman's allegation that Acker shared Hoffman's mugshot with other employees, Hoffman testified, "It's unladylike like to be – to have a mugshot right?  It's – that's not something that, you know, some people like to see in a woman." (Hoffman Dep. at 140:7–9, D. App. 092).  There is no evidence, however, that Acker shared Hoffman's mugshot because of Hoffman's sex.  Similarly, there is no evidence that Hoffman's allegations of being mocked, taunted, or disliked by fellow employees, or her belief that employees were recording her, was motivated by, or related to, her sex.  Hoffman merely asserts her own subjective belief regarding the motivation of Acker and other Bell employees, which is insufficient to show that such alleged conduct was because of Hoffman's sex.  *See Lenihan*, 994 F. Supp. at 793.

Accordingly, Hoffman fails the third prong and therefore "fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 249–50 (a "sufficient showing" consists of more than a scintilla of evidence in support of the party's position); *see also Slaughter v. Allstate Ins. Co.*, 803 F.2d 857, 860 (5th Cir.1986) (stating that "conjecture alone" was insufficient to raise

an issue as to existence of an essential element).  Therefore, summary judgment as a matter of law is warranted on this additional basis.

### c. Hoffman has not shown that the alleged harassment was sufficiently severe or pervasive.

Even if Hoffman could present evidence to meet the second and third prima facie elements, her claim still fails because she cannot demonstrate that the allegations of harassing comments and general conduct, or the allegations of inappropriate touching are severe or pervasive.  For harassment to be actionable, it must be sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment."  *See Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

A hostile work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so."  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998); *see also Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263–64 (5th Cir. 1999).  The objectionable conduct must affect the "conditions" of the alleged victim's employment.  *Oncale v. Sundowner Offshores Svcs., Inc.*, 523 U.S. 75, 81 (1998).  Title VII does not prohibit all verbal or physical harassment in the workplace but is directed only to an employer's discrimination "because of" sex.  *Indest*, 164 F.3d at 264.  "[C]asual or isolated manifestations of a discriminatory environment are not sufficient to demonstrate a hostile working environment under the law."  *Gearhart v.*

*Eye Care Centers of Am., Inc.*, 888 F. Supp. 814, 825 (S.D. Tex. 1995). "Incidental, occasional or merely playful sexual utterances will rarely poison the employee's working conditions to the extent demanded for liability." *Indest*, 164 F.3d at 264.

The Fifth Circuit has emphasized that the Supreme Court's decisions regarding sexually hostile work environment occur in cases involving allegations of "extensive, long-lasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiff's work environment." *See id.* (citing *Faragher*, 524 U.S. 775; *Ellerth*, 524 U.S. 742; *Oncale*, 523 U.S. 75; *Harris*, 510 U.S. 17; *Meritor Sav. Bank, FSB*, 477 U.S. 57). This illustrates that the sexual harassment standard is a "demanding" one to reach. *See Indest*, 164 F.3d at 264. The alleged conduct must be more than rude or offensive comments, teasing, or isolated incidents in order to survive summary judgment. *Shepherd v. Comptroller of Pub. Accts.*, 168 F.3d 871, 874–85 (5th Cir. 1999) (concluding alleged conduct was insufficiently severe or pervasive where plaintiff's co-worker touched plaintiff's arm, commented on size of the plaintiff's thighs while simulating looking up her dress, attempted to look down her shirt, made offensive remarks that included comments about color of her nipples, and offered to let plaintiff sit on his lap); *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 328 (5th Cir. 2004) (holding that sexually-suggestive comments, some instances of grabbing the plaintiff, and attempting to kiss the plaintiff did not qualify as severe); *Gibson v. Potter*, 264 F. App'x 397, 398 (5th Cir. 2008) (holding that a supervisor's conduct was not "sufficiently severe or pervasive to alter a term or condition of [plaintiff's] employment" even though the supervisor grabbed the plaintiff on the

buttocks and made suggestive comments to her while she was conversing with another employee).  As the Supreme Court explained, these high standards are required to ensure that Title VII does not become a "general civility code."  *See Faragher*, 524 U.S. at 788 (quoting *Oncale*, 523 U.S. at 80).

"Workplace conduct is not measured in isolation.  In order to deem a work environment sufficiently hostile, all of the circumstances must be taken into consideration."  *Hernandez*, 670 F.3d at 651 (citations and internal quotation marks omitted).  In determining whether an environment is "hostile" or "abusive," courts look at the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id*. (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).  Simple teasing, offhand comments, sporadic use of offensive language, occasional jokes related to a claimant's protected trait, and isolated incidents (unless extremely serious) will generally not amount to discriminatory changes in the terms and conditions of employment.  *See Boh Bros.*, 731 F.3d at 461.

For the reasons outlined below, Hoffman's claims fall far short of the relevant standards for a hostile work environment claim.  Hoffman simply claims that the alleged harassing comments, alleged harassing conduct by coworkers, and alleged inappropriate touching were severe and pervasive without providing any further explanation or evidence.  (*See generally* Compl.)  The undersigned has already addressed Hoffman's allegations regarding alleged harassing comments and conduct

by coworkers (*i.e.*, comments about her size and weight, assumptions regarding her sexuality, her mugshot being shown, fellow employees' alleged dislike of her, and her belief that employees were recording her) and explained that the record lacked any evidence that this conduct was sex-based. Similarly, the record lacks any evidence that these alleged harassing comments and other conduct were severe and pervasive. (*See, e.g.*, Compl. ¶ 77 (alleging she was subjected to discriminatory conduct "for her size, weight, and perceived failure to conform to traditional sex stereotypes" from 2020 to 2023).) Because these conclusory allegations, unsupported by specific facts, fall far short of the demanding standard for severe or pervasive conduct under Title VII, Hoffman has failed to present evidence from which a reasonable finder of fact could conclude that she suffered severe or pervasive harassment based on these allegations. Accordingly, such allegations do not suffice to defeat summary judgment.

Turning to Hoffman's allegations of inappropriate touching, Hoffman claims that Treiber made "systematic sexual advances," which she rejected. (*See* Compl. ¶¶ 39-40.) "Unwelcome sexual harassment" includes "sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature that is unwelcome in the sense that it is unsolicited or unincited and is undesirable or offensive to the employee." *Marquez v. Voicestream Wireless Corp.*, 115 F. App'x 699, 701 (5th Cir. 2004) (quoting *Wyerick v. Bayou Steel Corp.*, 887 F.2d 1271, 1274 (5th Cir. 1989)).

Although Hoffman's complaint recites one instance where Treiber allegedly placed his hand on her leg, requiring her to "prevent Treiber from reaching her upper leg and inner thigh by removing Treiber's hands from her body" and fondled her ankle "in a sexual way" (Compl. ¶ 38), Hoffman later recanted this allegation in her deposition testimony.  Hoffman testified that her complaint inaccurately described this event and that she did not interpret Treiber's actions to be sexual advances. (Hoffman Dep. at 178:24–25, App. 093; 181:10–25, App. 096.)  She also testified that Treiber never put his hand on her leg and only "tapped [her] on her ankle."  (*Id*. at 178:1-179:10, D. App. 093-94.)

Hoffman also asserts that Treiber gave her a hug and touched her elbow and shoulders.  (*See* Meneweather Decl. ¶ 4, D. App. 055; Ex. 1, D. App.059.)  While these incidents may have made Hoffman uncomfortable, she does not allege that such incidents of alleged inappropriate touching occurred more than once.  Although not specifically stated, the Fifth Circuit appears to measure the number of offensive acts that take place during a certain time period to determine pervasiveness—because the harassment must consist of more than "simple teasing, offhand comments, and isolated incidents (unless extremely serious)."  *Sanders v. Christus Santa Rosa PASC*, 995 F. Supp. 2d 626, 634 (W.D. Tex. 2014) (citing *Faragher*, 524 U.S. at 788).  As noted above, Treiber tapped Hoffman's ankle in a meeting once, gave her a hug once, and touched her elbow or shoulders once.

Analyzing the alleged harassment under the requisite totality of the circumstances, including the frequency and severity of Treiber's alleged conduct, as

39

well as the extent to which such conduct unreasonably interfered with Hoffman's work performance, the evidence fails to show that Treiber's conduct was sufficiently severe or pervasive enough to create a hostile work environment.  *See, e.g., Hernandez*, 670 F.3d at 652 ("only two incidents . . . over a ten-year period, [did] not create a fact issue that the harassment was 'sufficiently severe or pervasive' such that 'an abusive working environment' had been shown"); *Russell v. Univ. of Texas of Permian Basin*, 234 F. App'x 195, 205 (5th Cir. 2007) (concluding that the alleged harasser's conduct—rubbing the side of Russell's hand and her thigh on one occasion each, twice intimating that she wanted to move to New York City with Russell, once stating that she would not mind watching a movie in bed with Russell, and calling Russell "honey" or "babe" on numerous occasions—was neither severe nor pervasive); *Hockman*, 407 F.3d at 327–28 (concluding plaintiff could not establish hostile work environment where the alleged harasser, among other things, commented about another employee's body, slapped her on the behind with a newspaper, grabbed or brushed against her breast and behind, and once attempted to kiss her); *but see Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 402 (5th Cir. 2013) (concluding that two male employees "sniffing and hovering" over a woman in a small, confined space was sufficiently pervasive because "[plaintiff] worked in a small office area and was subject to each man's objectionable conduct approximately twelve times over four days . . . which can be seen as 'physically threatening,' 'humiliating,' and frequent").

Because Hoffman has failed to present evidence from which a reasonable finder of fact could conclude that she suffered harassment based on her gender that was sufficiently severe or pervasive, her sexual harassment claim based on hostile working environment fails as matter of law.

## C.     Hoffman's Retaliation Claim

To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in activity protected by the discrimination laws; (2) she was subjected to an adverse employment action subsequent to the protected activity; and (3) a causal connection exists between her participation in the protected activity and the adverse employment action.  *See Holt v. JTM Indus., Inc.*, 89 F.3d 1224, 1226 (5th Cir. 1996). If the plaintiff makes a prima facie case, the employer must articulate a legitimate, non-retaliatory reason for its action.  *See Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 433 (5th Cir. 1995).  Following the articulation of the non-retaliatory reason, the plaintiff must prove the articulated reason is merely pretextual and that "but for" her protected activity, she would not have been discharged.  *See Ray*, 63 F.3d at 433.  To defeat summary judgment, the plaintiff must produce substantial probative evidence that the proffered reasons were not the true reason for the employment decision and that the real reason was her participation in the alleged protected activity.  *See Chaffin v. John H. Carter Co.*, 179 F.3d 316, 319–20 (5th Cir. 1999); *see also Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483 (5th Cir. 2004).

For the reasons that follow, the undersigned concludes that Bell is entitled to summary judgment on Hoffman's retaliation claim because: (1) many of the alleged

retaliatory actions do not constitute adverse actions; (2) Hoffman's alleged reports of unlawful conduct do not constitute protected activity; and (3) Hoffman has not presented any evidence to show a causal connection between any protected activity and her termination.

### 1. Hoffman has failed to establish a prima facie case of retaliation.

Hoffman contends that she made "numerous" reports to Bell regarding the alleged discrimination and harassment she was experiencing (Compl. ¶¶ 74–76), but she specifies only three reports in her complaint. The first report allegedly occurred during the Summer of 2022 (the "Summer 2022 Report"), when Hoffman alleges that she reported Cordell to HR following a meeting where Cordell allegedly addressed various interactions Hoffman had with her coworkers including "slapping other employees' desks [and] belittling employees for not eating meat."  (*Id*. ¶¶ 33–34.)  The second report occurred in January 2023 (the "January 2023 Report") when Hoffman filed a report with Bell Security concerning allegedly suspicious interactions with other employees, after which Hoffman claims that that she suffered further generally harassing and discriminatory conduct.  (*Id*. ¶¶ 74–81.) The third report occurred in April 2023 (the "April 2023 Report") when Hoffman reported Treiber and Cordell's harassment.  (*Id*. ¶¶ 78–80.)

### a. Many of Hoffman's alleged retaliatory actions do not constitute adverse actions.

Like her hostile work environment claim, Hoffman relies on broad, conclusory descriptions of the alleged retaliatory conduct and identifies only a

limited number of incidents that she claims were retaliatory.  Specifically, Hoffman

claims that Bell retaliated against her when:

- Cordell issued the August 30, 2022 Written Warning (*id.* ¶ 36);

- Hoffman was moved to a desk away from her coworkers around February 2023 (*id.* ¶¶ 46–48);

- Two employees stared angrily at Hoffman in the elevator sometime after February 2023 (*id.* ¶ 50); and

- Hoffman was terminated in May 2023 (*id.* ¶ 81).

First, the undersigned concludes that the August 30, 2022 Written Warning

was not an adverse employment action for purposes of a prima facie case of

retaliation.  Bell issued the warning to Hoffman after she allegedly ignored her

supervisor and refused to attend a one-on-one meeting.  (Cordell Decl. ¶ 7, App. 051;

Ex. 1, App. 052).  Under Fifth Circuit law, for an action to be an adverse

employment action, "a plaintiff must show that a reasonable employee would have

found the challenged action materially adverse, which in this context means it well

might have dissuaded a reasonable worker from making or supporting a charge of

discrimination."  *DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 F App'x 437, 441

(5th Cir. 2007) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68

(2006)); *see also Spencer v. Shell Exploration & Prod. Co.*, No. 24-20173, 2025 WL

855314, at *3 (5th Cir. Mar. 19, 2025) (unpublished) ("As to the PIP" – or

performance improvement plan – "we have indicated that 'written warnings and

unfavorable performance reviews are not adverse employment actions where

colorable grounds exist for disciplinary action.'  Spencer fails to allege – in a non-

conclusory manner – that Shell's grounds for the PIP were pretextual or unjustified. The district court correctly dismissed this claim." (quoting *Jackson v. Honeywell Int'l, Inc.*, 601 F. App'x 280, 286 (5th Cir. 2015))); *Norwood v. Dall. Cnty. Hosp. Dist.*, No. 3:23-cv-1490-S, 2025 WL 607873, at *10 (N.D. Tex. Feb. 25, 2025)

In *DeHart*, the Fifth Circuit held that a written warning was not an adverse employment action for two reasons. First, "there were colorable grounds for the warning and a reasonable employee would have understood a warning under these circumstances was not necessarily indicative of a retaliatory mind-set." *Id*. at 442. Second, the "written warning did not in fact dissuade" the plaintiff from making a charge of discrimination with the EEOC. *Id*. Similarly, Hoffman would not have been dissuaded from making a complaint after this written warning, as there were colorable grounds for the warning. Additionally, Hoffman later filed the April 2023 Report (Meneweather Decl., Exhibit 1, D. App. 059-61) and her Charge with the TWC on July 31, 2023 (D. App. 062-64).

Concerning Hoffman's claim that she was moved to a desk away from coworkers, a reasonable employee would have understood why she was moved away from the individuals she had complained about as an investigation was pending regarding her complaints. (*See* Manriquez Decl. ¶ 6, D. App. 002.) Hoffman has presented no evidence to the contrary. Similarly, Hoffman's claim that two employees staring angrily at her in an elevator was retaliation for reporting the harassing conduct, the undersigned concludes that a reasonable employee would not have been dissuaded "from making or supporting a charge of discrimination" based

on this incident.  *DeHart*, 214 F. App'x at, 441.  Indeed, after these incidents,

Hoffman filed her April 2023 Report and her Charge on July 31, 2023, as previously

noted.

Hoffman's subjective belief that these actions were in retaliation for reporting

alleged discrimination and harassment, no matter how genuine, is insufficient to

show retaliation without further evidence.  *See Valderaz v. Lubbock Cnty. Hosp. Dist.*,

611 F. App'x 816, 824 (5th Cir. 2015) (citing *Pennington v. Texas Dep't of Family &*

*Protective Servs.*, 469 F. App'x 332, 339 (5th Cir. 2012).  More importantly, however,

these are not adverse employment actions.  Adverse employment actions are defined

as "ultimate employment decisions," such as "hiring, granting leave, discharging,

promoting and compensating."  *Walker v. Thompson*, 214 F.3d 615, 629 (5th Cir.

2000) (internal quotations omitted).  Accordingly, to the extent Hoffman bases her

retaliation claim on the incidents summarized above, they are not adverse actions

and cannot support her retaliation claim.  That leaves Hoffman's termination as the

only retaliatory action that constitutes an adverse action.

### b.  Hoffman's alleged reports of unlawful conduct do not constitute protected activity.

In addition, Hoffman has not shown that any of her alleged reports of

unlawful conduct qualified as protected activity.  First, Hoffman's retaliation claim

based on the Summer 2022 Report fails because it occurred more than 300 days

before she filed her Charge and is therefore time-barred.  The Summer 2022 Report

also fails because Hoffman cannot satisfy the third element of a prima facie

retaliation claim—causal connection. Even if the Summer 2022 Report qualified as protected activity and was not time barred, Hoffman has provided no evidence to connect this report to her termination in May 2023, over 10 months later.

Next, Hoffman's retaliation claim based on the January 2023 Report fails because she does not establish the first prong of her prima facie case—that the report qualifies as an activity protected by Title VII. Title VII does not protect opposition to all forms of unscrupulous conduct. *Brown v. United Parcel Serv., Inc.*, 406 F. App'x 837, 840 (5th Cir. 2010) (internal citation omitted). "Magic words are not required, but protected opposition must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue." *Id.* A vague complaint about bullying without any reference to illegal discrimination is not protected activity. *See Davis v. Dallas Indep. Sch. Dist.*, 448 F. App'x 485, 493 (5th Cir. 2011) (internal citation omitted). The January 2023 Report lacks any reference to indicate that the reported conduct was motivated by Hoffman's sex, and she has provided no evidence from which a reasonable finder of fact could conclude that this report qualifies as protected activity under Title VII. Even when interviewed by Bell Security and E&C, Hoffman only identified vague instances of interpersonal issues but did not suggest that the issues were in any way related to her sex. (Mercer Decl. ¶ 4, 019, 023; Ex. 1, D. App. 039–041.)

46

### c. Hoffman has not presented any evidence to show a causal connection between any protected activity and her termination.

To determine the existence of a causal link, courts look to three factors: (1) the employee's past disciplinary record, (2) whether the employer followed its typical policy and procedures in terminating the employee, and (3) the temporal proximity between the employee's conduct and termination. *Nowlin v. Resolution Trust Corp.*, 33 F.3d 498, 508 (5th Cir. 1994). Although Hoffman points to the timing between the April 2023 Report and her termination, "the mere fact that some adverse action is taken after an employee engages in some protected activity will not always be enough for a prima facie case." *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 655 (5th Cir. 2004) (quoting *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 n. 3 (5th Cir. 1997)).

Here, Hoffman's prior disciplinary record demonstrates that Bell followed its usual procedures in terminating Hoffman when she continued to engage in disrespectful behavior and insubordination. She had been counseled for disrespectful and insubordinate behavior and had received two written warnings about her behavior before she was terminated. On August 30, 2022, Hoffman received a Written Warning for ignoring her supervisor and refusing to attend a scheduled one-on-one meeting. When she continued to exhibit insubordination toward leadership and failed to demonstrate sustained improvement after being counseled, Hoffman received the Final Written Warning and Disciplinary Suspension on April 3, 2023, for again being disrespectful toward her supervisor. The Final Written Warning

advised Hoffman that she would need to "maintain a respectful and professional demeanor towards all individuals at all times and refrain from any future inappropriate behavior and/or violation of Company policy." (Doyle Decl. Ex. 1, D. App. 016.)

Hoffman acknowledged that she understood the serious nature of her unsatisfactory behavior and recognized that further inappropriate behavior would result in termination of her employment. (*Id.*) Yet, less than three weeks later, in the first check-in meeting with Treiber and Meneweather following the Final Written Warning, Hoffman's disrespectful and insubordinate behavior not only continued, but escalated. Hoffman was combative and disrespectful to both Treiber and Meneweather. (Meneweather Decl. ¶ 11, D. App. 056.) Hoggatt, whose office is a few doors down from where the meeting took place, could hear Hoffman raising her voice on multiple occasions, talking over Treiber, and ignoring Meneweather's instructions to remain professional. (Hoggatt Decl. ¶ 10, D. App. 006.)

And despite the temporal proximity between Hoffman's submission of the report on April 27, 2023, and her termination on May 2, 2023, the undisputed evidence shows that, on April 26, 2023, the day prior to Hoffman's report, Hoggatt had already requested approval to terminate Hoffman based on the continued insubordination shown in her email exchanges with Treiber and Hoggatt regarding Treiber's management of his team and his decision to not include Hoffman in conversations with one of Bell's suppliers. (Hoggatt Decl. Ex. 2, D. App. 011.) The April 2023 Report, therefore, had no bearing on Bell's decision to terminate

48

Hoffman.  Furthermore, Hoffman had multiple opportunities to report her allegations regarding Treiber during the E&C investigation.  The E&C investigator specifically asked Hoffman if she had any other concerns to bring to her attention, and she stated that she did not.  (Mercer Decl. ¶ 4, D. App. 030.)  Instead, Hoffman chose to wait until the day she was scheduled to have her first check-in meeting with Meneweather and Treiber following her Final Written Warning to report Treiber's alleged inappropriate behavior.  (*Id.*; Ex. 1, D. App. 055, 059.)   Furthermore, the undisputed evidence shows that Hoffman retracted many of the allegations in her complaint regarding Treiber's alleged inappropriate conduct (*see* Hoffman Dep. at 178:24–25, App. 093; 181:10–25, App. 096), which further undermines the existence of any causal connection between Hoffman's report on April 27, 2023, and her termination on May 2, 2023.

Finally, Hoffman vaguely contends that she complained to the EEOC that she was "suffering from sex discrimination" between 2020 and 2023.  (Compl. ¶ 74.)  But the only charge of discrimination filed by Hoffman was filed on July 31, 2023, after her termination.  (*See* D. App. 062-64.)  Because Hoffman has not presented any evidence that she filed a charge of discrimination prior to July 31, 2023, the July 2023 Charge cannot be the basis for her retaliation claim.

Based on the foregoing, the undersigned concludes that Hoffman has not demonstrated a causal connection between any protected activity and her termination. Because Hoffman cannot make even a prima facie case of retaliation, dismissal is warranted.

### 2. Bell has provided legitimate reasons for terminating Hoffman.

Even if Hoffman could establish the prima facie elements of her retaliation claim, her claim still fails as a matter of law because Bell provides legitimate reasons for its decision to terminate Hoffman's employment that are not related to any alleged protected activity. *See Marcantel v. State of La. Dep't of Transp. & Dev.*, 37 F.3d 197, 199 (5th Cir. 1994) ("[E]mployer bears only the burden of producing evidence which explains clearly that the employment decision was not pretextual but was motivated by a legitimate, nondiscriminatory reason"). Hoffman has not present evidence that, if credited by a fact finder, would show that Bell's reason was pretext.

Bell has presented competent summary judgment evidence showing that Hoffman was terminated for failing to correct insubordinate behavior identified in multiple disciplinary actions preceding her termination, which constitutes a legitimate nondiscriminatory and nonretaliatory reason, and Hoffman has presented no evidence to rebut this evidence or to show that Bell's proffered non-retaliatory reasons for termination are pretext.

To overcome Bell's legitimate nondiscriminatory reason for its employment decision, Hoffman must show something beyond disagreement with Bell's decision. *See Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 332 (5th Cir. 2019); *see also Smith v. Shinseki*, 716 F. Supp. 2d 556, 564 (S.D. Tex. 2009) ("[I]t is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination."). Here, Hoffman has not shown that the legitimate, non-retaliatory reasons asserted by Bell are a pretext for unlawful retaliation, nor has

she presented any competent evidence of a retaliatory motive.  In fact, Hoffman has presented no evidence whatsoever.

Because there is no evidence supporting a finding that Bell's proffered non-retaliatory reasons for termination are pretext, summary judgment is warranted on Hoffman's retaliation claim.  *See, e.g.*, *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808–09 (5th Cir. 2007) (affirming summary judgment for employer where plaintiff failed to establish that the employer's reasons for termination were pretextual, and plaintiff did not establish but-for causation); *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188–89 (5th Cir. 1997) (rendering judgment for employer on retaliation claim where employer offered legitimate reasons explaining the adverse action, and plaintiff failed to show that the employer's reorganization was a pretext or that the employer had a retaliatory motive).

## IV.  RECOMMENDATION

Because Hoffman has failed to present sufficient summary judgment evidence to create a genuine issue of material fact on any of her claims, the undersigned recommends that Bell's Motion for Summary Judgment (Dkt. No. 26) be **GRANTED**, and Hoffman's claims be **DISMISSED WITH PREJUDICE**.

**SO RECOMMENDED** on May 1, 2026.

_____
BRIAN McKAY
UNITED STATES MAGISTRATE JUDGE

51

## NOTICE OF RIGHT TO OBJECT

A copy of these findings, conclusions, and recommendation will be served on all parties in the manner provided by law.  Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  To be specific, an objection must identify the finding or recommendation to which objection is made, state the basis for the objection, and indicate the place in the magistrate judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996), *modified by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections to 14 days).